UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-10158-RGS

ANTONIO LARDE

v.

COMMONWEALTH ZOOLOGICAL CORPORATION, ROBERT CHABOT
and JENNIFER CANE

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

October 28, 2022

STEARNS, D.J.

Antonio Larde brought this lawsuit against his former employer, Commonwealth Zoological Corporation (the Zoo); Jennifer Davis Cain, the Zoo's Head of Human Resources; and his direct supervisor Robert Chabot. Larde alleges that the defendants discriminated against him based on disability and race, and retaliated against him for exercising his rights under the Family Medical Leave Act (FMLA) and under federal and state civil rights laws. The Zoo moves for summary judgment pursuant to Fed. R. Civ. P. 56. The court will allow the motion in part.

## BACKGROUND

In the light most favorable to Larde as the non-moving party, the material facts related to the discrimination claims are as follows.  The Zoo hired Larde, an African-American man, as its Director of Facilities on April 17, 2017.  *See* Defs.' Statement of Undisputed Material Facts (Dkt # 43) ¶ 5 (Defs.' SOF).  In August of 2017, Chabot was hired as Chief Operating Officer of the Zoo, becoming Larde's immediate supervisor.  *Id.* ¶ 11; Pl.'s Statement of Disputed Material Facts (Dkt # 46) at 2 (Pl.'s SOF).  In his duties as Director of Facilities, Larde worked alongside Davis Cain.  Defs.' SOF ¶ 3.

On June 2, 2018, as part of his duties as a supervisor of the Facilities Department, Larde terminated Allan Briggs, a Zoo Park Services Associate.  *Id.* ¶ 29.  Briggs did not go quietly – the termination ended in a fistfight in which Briggs was the aggressor.  Pl.'s SOF at 2.  Larde suffered serious trauma to his right eye, face, and left shoulder.  Wyatt Aff. (Dkt # 47) at Ex. 3.  Larde received workers' compensation and took twelve weeks of FMLA leave, followed by an additional seven weeks of leave granted by the Zoo as a disability accommodation under Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Massachusetts General Laws chapter 151B (Chapter 151B).  Defs.' SOF ¶ 37.  Larde resumed work at the Zoo on October 15, 2018.  *Id.*, Ex. 21 at 4.

On his return, Larde learned that his private office had been reassigned to the Zoo's Safety & Security Manager and that he had been moved to a shared office space.  Pl.'s SOF at 6.  Larde contends that the relocation to the office where he had barricaded himself in the aftermath of the fight with Briggs triggered his latent PTSD.  Larde Aff. ¶ 29.

On Saturday, November 3, 2018, Chabot called Larde twice on his business cellphone after a tree had fallen on the Zoo's zebra barn, but Larde did not answer.  Defs.' SOF ¶¶ 61-62.  He returned Chabot's call the next day, Sunday, November 4, 2018.  *Id.*, Ex. 23 at 9.  Larde received verbal counseling for his failure to respond in a timelier fashion to Chabot.  *Id.* ¶ 67; Pl.'s SOF at 8.

In November of 2018, Larde was assigned to complete a portion of the Zoo's accreditation application for the Association of Zoos & Aquariums (AZA).  Defs.' SOF ¶ 71.  The Zoo determined that Larde had failed to complete his section accurately, and on March 27, 2019, issued Larde a written warning.  *Id.* ¶ 74; *id.*, Ex. 24.

In May of 2019, Jason Platt, a coworker, "approached Mr. Larde in an aggressive manner and slammed his fists on Mr. Larde's desk to intentionally intimidate him"; this confrontation triggered another bout of Larde's PTSD.  Pl.'s SOF at 9.  Larde reported the incident to Chabot, but Platt was not

reprimanded or disciplined. Larde Aff. ¶ 47. Chabot instead made "harassing comments related to [Larde's] anxiety, depression, and PTSD disabilities." *Id.* ¶ 46.

In August of 2019, Michael Bartlett, a Zoo employee under Larde's management, improperly terminated Emilio Chinn, another Facilities Department employee. Pl.'s SOF at 10. At the request of the Zoo, Larde investigated Bartlett's handling of Chinn's termination. *Id.* at 11. The Zoo faulted Larde for his handling of the investigation and concluded that Larde had failed to properly train Bartlett in the Zoo's termination process. Defs.' SOF ¶¶ 81-86.

On August 23, 2019, Larde suffered a job-related foot and ankle injury. He reported the injury to Chabot and applied a second time for workers' compensation. Pl.'s SOF at 11-12; Defs.' SOF, Ex. 21 at 54. Larde filed a written report regarding the injury on September 17, 2019, but only after being asked to do so by the Zoo. Pl.'s SOF at 12. On September 19, 2019, Chabot and Davis Cain issued Larde a "first step" verbal counseling regarding his failure to follow the Zoo's procedure for reporting injuries. *Id.* at 12-13. Larde was also issued a "second step" written warning after Chabot and Davis Cain concluded that Larde had mishandled the investigation into Bartlett's firing of Chinn. *Id.* at 13-14.

4

In their meeting on September 19, 2019, Larde complained to Davis Cain and Chabot that he was receiving harsher treatment than other employees as part of a "longstanding pattern of harassment," citing the disciplinary actions taken after his foot and ankle injury, workers' compensation claim, and leave request.  *Id.* at 15.  Later that September, Larde specifically accused Chabot of treating him more harshly than his non-African-American direct reports.  *Id.*  Larde alleges that Chabot angrily responded, "I didn't hire you."  Larde interpreted Chabot's remark as "referencing Mr. Larde's skin color in connection with his statement."  *Id.* at 15-16.  On October 1, 2019, Larde met separately with Davis Cain to complain about Chabot's outburst.  *Id.* at 16-17.

From January 7, 2019, through October 24, 2019, Larde was involved in extended discussions with the State Fire Marshal Inspector about the need to bring the Zoo's boilers up to code.  Defs.' SOF ¶¶ 90-95.  The boilers had failed inspection on January 7, 2019, October 1, 2019, and October 23, 2019.  *Id.*, Ex. 27 at 95-99.  Larde states that the boilers were old and difficult to bring into compliance, and that Chabot had refused Larde's request to replace them.  Pls.' SOF at 20.  On October 24, 2019, the Inspector emailed the Zoo, stating that the boiler situation "at this facility not only violates Mass

Codes and regulations it willfully contributes to create a safety hazard . . . .
The Zoo has been out of compliance for nearly a year." Defs.' SOF ¶ 95.

On October 28, 2019, after receiving the Inspector's email, the Zoo
terminated Larde, citing a "pattern of work performance failures." *Id.* ¶ 96.
On May 15, 2020, Larde filed charges with the Massachusetts Commission
Against Discrimination (MCAD) and the United States Equal Employment
Opportunity Commission (EEOC). Compl. ¶ 89. Following a voluntary
dismissal of the MCAD charge on December 4, 2020, and receipt of a Right
to Sue letter from the EEOC on December 7, 2020, Larde filed this Complaint
on January 28, 2021. Before the court is the Zoo's motion for summary
judgment.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings,
affidavits, and depositions, "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue,
viewed in the light most flattering to the party opposing the motion, must be
sufficiently open-ended to permit a rational factfinder to resolve the issue in
favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d
731, 735 (1st Cir. 1995) (citation omitted). However, "'the mere existence of

6

a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Larde makes eleven claims against the Zoo: (1) race discrimination under 42 U.S.C. § 2000e *et seq.* (Title VII); (2) race and color discrimination under 42 U.S.C. § 1981 *et seq.* (§ 1981); (3) race discrimination under Chapter 151B; (4) disability discrimination and failure to accommodate under the ADA; (5) handicap discrimination and failure to accommodate under  Chapter 151B; (6) interference with and retaliation for exercising rights under 29 U.S.C. § 2615 (FMLA); (7) retaliation under Title VII; (8) retaliation under § 1981; (9) retaliation under Chapter 151B; (10) retaliation under the ADA; and (11) retaliation under Massachusetts General Laws chapter 152 § 75B (Workers' Compensation Act or WCA).  The following claims are also asserted against Davis Cain and Chabot in their individual capacities:[1] race and color discrimination under § 1981; race discrimination

---

[1] Massachusetts law permits a finding of individual liability for discriminatory employment practices. *See* Mass. Gen. Laws ch. 151B § 4(5). ("It shall be an unlawful practice . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.").  Under First Circuit precedent, Title VII and ADA liability run only to the employer. *See*

under Chapter 151B; handicap discrimination and failure to accommodate under Chapter 151B; interference with and retaliation for exercising rights under the FMLA; retaliation under § 1981; and retaliation under Chapter 151B.

### A. Race Discrimination Under Title VII, § 1981, and Chapter 151B

The court will first address Larde's federal and state race discrimination claims in one piece. Because Larde has not offered direct evidence of unlawful discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001); *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 420 (2003). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case giving rise to an inference of discrimination.  To meet this burden, the plaintiff must show: "that (1) he is a member of a protected class; (2) he was qualified for the job; [and] (3) the employer took an adverse employment action against him."  *Kosereis v. Rhode Island*, 331 F.3d 207, 212-213 (1st Cir. 2003).  Federal law imposes an additional requirement: Larde must also

---

*Roman-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 52 (1st Cir. 2011); *Fantini v. Salem State Coll.*, 557 F.3d 22, 28-31 (1st Cir. 2009).

8

show "(4) [that his] position remained open or was filled by a person with similar qualifications." *Id.*

      1. *Prima Facie* Case

The Zoo contends that Larde fails the second prong of the *prima facie* case because he was not performing his job at an acceptable level. Defs.' Mem. Supp. Summ. J. (Dkt # 42) at 11 (Defs.' Mem.). The Zoo offers several (contested) examples of unsatisfactory job performance on Larde's part, notably those related to the incidents that led to his disciplinary correctives, warnings, and ultimate termination. *See id.* They include Larde's alleged mishandling of the termination of Terrance Gilliard in June of 2017, his failure to see to the repair of the Zoo kitchen hood, his failure to meet the improvement areas identified in his performance review, his mishandling of the terminations of Allan Briggs on June 2, 2018, and Emiliio Chinn in August of 2019, his failure to timely respond to a weekend emergency call regarding the zebra barn on November 3, 2018, and his receipt of an unsatisfactory performance review in March of 2019.

Larde's burden at the *prima facie* stage is not an onerous one. *See Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003); *see also Walker v. City of Holyoke*, 523 F. Supp. 2d 86, 102 (D. Mass. 2007) ("[C]ourts that have dismissed discrimination claims at the *prima facie* stage based on

unsatisfactory job performance have tended to do so where the employee's poor record was undisputed or unrelated to the alleged discrimination.").

As in *Walker*, Larde "disputes the details of some of the incidents for which [he] was disciplined (including the one for which [he] was fired . . .)." *Id.* For example, he disputes the Zoo's account of his alleged mishandling of the Gilliard termination. Larde also asserts that he "did not show any bona fide signs of distress during the meeting and was present for the whole meeting where Mr. Gilliard was fired . . . [and] properly fulfilled all his duties during the meeting related to the firing of Mr. Gilliard." Larde Aff. ¶ 80. This account is supported to some degree by the Zoo's own evidence, which indicates that while Davis Cain did assist Larde with the termination, there was no point at which Davis Cain was left alone with Gilliard (as the Zoo now alleges). Defs.' SOF, Ex. 4 at 60: 4-6, 12-14.

Larde also disputes the Zoo's assertion that he failed in his role as the Director of Facilities to see to the repair of the Zoo kitchen hood. Larde maintains that the Zoo's restaurants "were operated by an independent third party entity called Center Plate," and that "[i]t was the ultimate responsibility of the third party contractor that ran the restaurants to replace the hood." Larde Aff. ¶¶ 83-84. *See also* Defs.' SOF, Ex. 34 (quoting a September 18, 2017 email in which an executive of the Zoo writes, "I may be

misremembering, but I thought [Center Plate] was going to do the work at K. Kitchen and [the Zoo] would pay").

The Zoo also points to Larde's failure to satisfactorily address areas of improvement identified in his latest February 12, 2018 performance review, Defs.' Mem. at 5, although Larde counters that those were not areas of "needed improvement" but rather "new goals" that all employees were required to establish during the review.  Pl.'s SOF at 44-45.

Larde also disputes the Zoo's assertion that he mishandled the terminations of two employees under his supervision (Briggs and Chinn). The Zoo states that Larde botched the Briggs termination by "wait[ing] until the end of the day to terminate" Briggs contrary to Davis Cain's instruction that he "do it first thing in the morning."  Defs.' SOF, Ex. 3 at 7.  Larde counters that neither he nor Briggs were scheduled to work that morning, and that he terminated Briggs as soon as they both arrived as scheduled. Larde Aff. ¶ 92.[2]

Larde also disputes the Zoo's account that he failed to answer his phone for "multiple days before responding" to Chabot's call about the collapse of the tree on the zebra barn.  Defs.' Mem. at 5; Defs.' Reply Pl.'s Opp. (Dkt

---

[2] There is a similar complaint about Larde's failure to follow established protocol in overseeing the firing of Chinn, although again Larde disputes some of the details.  *See* Defs.' SOF, ¶¶ 85-86; Larde Aff. ¶ 119.

# 53) at 5 ("The Plaintiff never returned Mr. Chabot's calls that weekend.").
Larde maintains that he returned Chabot's call the next day, Sunday, less than twenty-four hours after the first call was placed. Larde Aff. ¶ 105.

Finally, the Zoo points to Larde's "unsatisfactory rating at his March 2019 annual review based on his poor performance," Defs.' Mem. at 6, although Larde counters that his rating, while middling, Defs.' SOF, Ex. 26, was not deemed unsatisfactory.

Whatever their ultimate merit, Larde's point-by-point dispute of the Zoo's thick catalog of reasons for his termination takes his case out of the thin mine-run of cases envisioned by the court in *Walker* in which a plaintiff's employment discrimination claim tripped on the performance prong of the *prima facie* case and allows him to proceed.

## 2. Legitimate, Non-Discriminatory Reason

At the second stage of *McDonnell Douglas*, the Zoo must articulate a legitimate, non-discriminatory reason for terminating Larde. "The employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion." *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir. 2007). Moreover, at this stage, the focus of the court "'must be on the perception of the decision maker,' that is, whether the employer believed its stated reason to be credible." *Mesnick*

*v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (citation omitted).  "[T]he employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext."  *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996).  Looking from a Zoo-as-employer perspective at the list of job deficiencies (however disputed) produced by the Zoo in its challenge to Larde's *prima facie* case, the Zoo has met its burden of producing a nondiscriminatory justification for Larde's termination.

### 3.  Pretext Analysis

Thus, the burden shifts back to Larde to come forward with evidence showing that the Zoo's proffered reasons are a pretext and that a discriminatory animus was at the heart of its actions.  And "[d]espite [the] shifting burdens of production, the plaintiff throughout retains the burden of persuasion."  *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999).  It falls to Larde to come forward with evidence of "specific facts which would enable a jury to find that the reason[s] given [by the Zoo were] . . . a sham intended to cover up the employer's real motive: discrimination."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1994).

In the first instance Larde cites to Chabot's statement, "I didn't hire you," as evidence of discriminatory animus.  This is a stretch, as the statement on its face is one of fact and not derogation.  *Cf. Fernandes v.*

*Costa Bros. Masonry*, 199 F.3d 572, 583 (1st Cir. 1999) (a statement that can *plausibly* be interpreted in two ways, one discriminatory and one not, is not direct evidence of discrimination).   Moreover, direct evidence does not include so-called "stray" remarks.  *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996); *Fontane v. Ebtec Corp.*, 415 Mass. 309, 314 n.7 (1993).

Larde next complains that the verbal counseling that he received from Chabot for failing to respond to his weekend calls was pretextual because "in general, other employees at my level were not disciplined for failing to respond to phone calls within less than 24 hours of receiving calls on their days off, especially for a single incident that was not part of a broader pattern."  Larde Aff. ¶ 43.  If true, this may reflect an overly demanding approach to management on Chabot's part, but it does not manifest racial animus.

Larde next points to the fact that Chabot gave pay raises to his other direct reports and the Facilities staff while omitting him.  *Id.* ¶¶ 44-45.  The record, however, indicates that Chabot had at least one other African American direct report and one African American employee in the Facilities department, who did receive pay raises.  Again, Chabot may have acted

unfairly, but there is no evidence that he excluded Larde from a pay raise because of his race.

Additionally, Larde argues that the Zoo deviated from its progressive discipline policy by issuing him two of the policy's steps on the same day and skipping the last step before his termination.  Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. (Dkt # 45) at 14 (Pl.'s Mem.).  While a "[d]eviation from established policy or practice may be evidence of pretext," *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998), the First Circuit has held that deviation evidence does not support pretext where the employer "reserves the right to skip steps in implementing its progressive discipline policy."  *Micheo-Acevedo v. Stericycle of P.R., Inc.*, 897 F.3d 360, 366 (1st Cir. 2018) (internal quotations omitted).  The Zoo's policy states that while the Zoo "generally" uses a progressive approach, it "may impose greater or lesser corrective action based on its view of all the circumstances."  Wyatt Aff., Ex. 23 at ZNE_2_001082; Wyatt Aff., Ex 12 at 137.

Larde alleges in conclusory terms that white, non-disabled manager-level employees were not disciplined for similar or worse issues in completing the AZA Accreditation form.  However, he points to no white managers who completed the form unsatisfactorily whose shortcomings were similar to his.  While the alleged workplace offenses do not need to be

identical to find that employees are similarly situated, "the offenses must be of comparable seriousness." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 130 (1997), citing *McDonnell Douglas*, 411 U.S. at 804.  Larde cites four "unacceptable" findings in portions of the AZA report completed by others, Pl.'s SOF at 26-28, that he claims were "equally serious, or more serious than the boiler code issues."  Larde Aff. ¶ 124.  But there is no evidence that these findings are comparable in severity to the boiler issue, which the State Fire Marshal called an "unacceptable and prolonged situation" that "willfully contributes to create a safety hazard to all employees, contractors, vendors, thousands of members of viewing public, and hundreds of animals."  Defs.' SOF, Ex. 27 at 73.  In contrast, the four "unacceptable" findings in the AZA report are among hundreds of "acceptable" findings – nor is there any indication that the Zoo failed AZA accreditation as a result. *See* Wyatt Aff., Ex. 27.

Finally, Larde cannot establish that he is similarly situated to his white (or non-African American) counterparts because he fails to address whether any of the identified employees had a similar history of conflict with their supervisors or had compiled a similarly poor disciplinary record.  In sum, Larde has failed to satisfy his burden of demonstrating that the Zoo's justifications for his termination, whatever their soundness, were a pretext

for discrimination.  Summary judgment will therefore enter for the Zoo as to Counts I, II, and III.

### B. *Disability Discrimination and Failure to Accommodate Under the ADA and Chapter 151B*

The *McDonnell Douglas* burden-shifting framework also applies to Larde's disability discrimination claims.  To establish a *prima facie* case of disability discrimination under the ADA and Chapter 151B,[3] Larde must show "(1) he has a disability within the meaning of the law; (2) he is nonetheless able to perform the essential functions of his job, with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) his employer replaced him with a non-disabled person or otherwise sought to fill the job." *Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 511 (1st Cir. 1996).   For his reasonable accommodation claim, Larde must demonstrate "in addition to the first two prongs set forth above, that [the employer], despite knowing of his alleged disability, did not reasonably accommodate it." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002).

Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities

---

[3] Because Chapter 151B "tracks the ADA in virtually all respects," *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002), the court addresses Larde's state and federal claims together.  *See Tate v. Dep't of Mental Health*, 419 Mass. 356, 361 (1995).

of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Bailey v. Ga.-Pac. Corp.*, 306 F.3d 1162, 1166-1167 (1st Cir. 2002), citing 42 U.S.C. § 12102(2).

Larde claims mental or physical impairments, including an incident of trauma to his right eye, face, and left shoulder; anxiety; PTSD; and hypertension. *See* Pl.'s Mem. ¶¶ 11, 45; *see also* Larde Aff. Ex. D. Medical evidence is not required to survive summary judgment at this stage and "[a] plaintiff's detailed description of his limitations, standing alone, often will be sufficient to overcome the "relatively low bar created by the substantially-limits and summary-judgment standards." *Mancini v. City of Providence*, 909 F.3d 32, 43-44 (1st Cir. 2018). But, as the First Circuit has observed, "[a] relatively low bar . . . is not the same as no bar at all." *Id.* at 44. Larde must "point out some competent evidence in the summary judgment record sufficient to show substantial limitation." *Id.*

In weighing the plaintiff's evidence in *Mancini*, the First Circuit set out an instructive example of a deficient showing, rejecting a plaintiff's conclusory allegations that her alleged back impairment "when active substantially limit[ed] one or more of [her] major life activities, including but not limited to, walking, bending and sitting." *Id.*, quoting *Holton v. First Coast Serv. Options, Inc.*, 703 F. App'x 917, 921 (11th Cir. 2017). Similarly,

in *Mancini* itself, the Court found that plaintiff's statement that his "knee injury substantially limited his ability to stand, walk, [and] bend . . . such that he could not perform the essential functions of [his] position" was "wholly conclusory." *Id.* This contrasted with the plaintiff in *Williams v. Tarrant Cty. Coll. Dist.*, whose affidavit "elaborated in detail upon the plaintiff's injuries, symptoms, and treatment." *Id.*, citing *Williams*, 717 F. App'x 440, 447 (5th Cir. 2018)

Larde's affidavit falls in the same category as *Holton* and *Mancini*. Larde states in conclusory fashion that his attack-related injuries "substantially limited one or more of my major life activities, including but not limited to, walking talking, lifting and breathing. The effects of these injuries persisted. As such, I was disabled under the . . . [ADA] and handicapped under Massachusetts law." Larde Aff. ¶ 10. He provides a similarly vague account of his anxiety, PTSD, and hypertension conditions. *See id.* ¶¶ 12-16, 48. While Larde does offer some documentation of his physicians' diagnoses, the doctors do not offer any further detail as to the extent of his injuries and symptoms beyond Larde's self-reports. *Id.*, Exs. B-D. Because Larde has failed to show in sufficient detail that his impairments constituted substantial limitations to major life activities, he cannot establish

a *prima facie* case of disability discrimination.   Summary judgment will therefore enter for the Zoo as to Counts IV and V.

### C. Retaliation Under the FMLA, Title VII, § 1981, M.G.L. c. 151B, the ADA, and the WCA

Federal and state law are identical in applying the *McDonnell Douglas* framework to retaliation claims.[4] *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 69 (1st Cir. 2015) (FMLA); *Hernandez-Torres v. Intercont'l Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998) (Title VII); *Surprise v. Innovation Grp., Inc. / First Notice Sys., Inc.*, 925 F. Supp. 2d 134, 141 n.4 (D. Mass. 2013) (ADA and Chapter 151B).  Both federal law (Title VII and the ADA) and state law (Chapter 151B) protect an employee who has opposed an unlawful employment practice from retaliation by the employer.  *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009), *quoting Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Mole v. Univ. of Mass.*, 442 Mass. 582, 591 n.13 (2004).  Protected conduct includes the filing of internal grievances as well as formal complaints.  *Ritchie v. Dep't of State Police*, 60

---

[4] *See Favreau v. Liberty Mut., Inc.*, 451 F. Supp. 3d 150, 175 (D. Mass. 2020) ("If an employer commits retaliatory acts of interference, however, the analysis must be conducted under the retaliation framework.").  Larde's claim of FMLA interference arises from the Zoo allegedly "disciplining Mr. Larde for uncompleted tasks while Mr. Larde was on FMLA leave." Compl. ¶ 162.

Mass. App. Ct. 655, 664-665 (2004); *Fantini*, 557 F.3d at 32, quoting *Sumner*, 899 F.2d at 209.[5]

> a. *Prima Facie* Case

A *prima facie* case under federal and state law requires a showing that a plaintiff engaged in legally protected conduct, suffered an adverse employment action, and that the two elements were causally connected.[6] *Mole*, 442 Mass. at 591-592; *Valentin-Almeyda v. Mun. of Aguadetta*, 447 F.3d 85, 94 (1st Cir. 2006); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998). In instances where the adverse action comes closely on the heels of protected activity, a plaintiff may show causality based on temporal proximity. *Mole*, 442 Mass. at 595; *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87-88 (1st Cir. 2016). *See Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012), quoting *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 25 (1st Cir. 2004) ("'[V]ery close' temporal

---

[5] Larde's FMLA claims are limited to taking FMLA leave as protected conduct, but for efficiency, the court will discuss his FMLA retaliation claim in tandem with the others.

[6] In *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013), the Supreme Court held that Title VII requires a plaintiff to show that his or her protected activity was the but-for cause of the adverse action by the employer, specifically rejecting the less stringent standard that the plaintiff must show only that retaliation was a "motivating" factor. *See also Edwards v. Commonwealth*, 488 Mass. 555, 571 (2021) (articulating the same standard under Massachusetts law).

proximity between protected activity and an adverse action can satisfy a plaintiff's burden of showing causal connection."); *see also Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action.").

At the summary judgment stage, Larde can satisfy this element by "raising a genuine issue as to whether defendants took . . . adverse employment action against [him], other than termination." *Chery v. Sears, Roebuck & Co.*, 98 F. Supp. 3d 179, 195 (D. Mass. 2015) (internal quotations omitted). Adverse employment actions are not limited to termination and can include "disadvantag[ing] [plaintiff] in respect to salary, grade, or other objective terms and conditions of employment." *Id.*, quoting *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 160 (1st Cir. 2009). Other examples include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002) (internal quotations omitted).

Viewing the facts in the light most favorable to Larde at the summary judgment stage, there is a genuine issue regarding his retaliation claims. First, Larde argues that the Zoo created a harassing and hostile work

environment upon his return from FMLA leave.  He states that Chabot was "noticeably colder" after his return.  Larde Aff. ¶ 24.  He also cites Chabot's alleged "harassing comments related to [his] anxiety, depression, and PTSD disabilities." *Id.* ¶ 46.

Second, Larde points to the loss of his private office.  He notes that having a private office was *de rigueur* for an employee of his status and that his transfer to a shared office space that was "often noisy" "made it more difficult" for him to do his job.  *Id.* ¶¶ 25-28.  The office relocation was also distressing to Larde, triggering a PTSD flare-up and his anxiety and depression, because part of the attack that caused his injuries had allegedly involved that same office.  *Id.* ¶ 29.[7]

Finally, Larde argues that the Zoo's imposition of discipline and inaccurate performance reviews were retaliatory.  The First Circuit has agreed that in addition to termination, an "unwarranted negative job

---

[7] The Zoo contests Larde's account, stating that the altercation "occurred outside, not in a building, and any suggestion to the contrary is demonstrably false." Defs.' SOF ¶ 53. But the Zoo's evidence leaves open the possibility that Larde's account is true. The Zoo submits video footage of the altercation between Briggs and Larde in the parking lot, showing that after the initial physical altercation had ended, Larde went inside the building and Briggs departed the scene. *See id.*, Ex. 30 at 11:27. A few minutes later, Briggs returned to the parking lot and re-entered the building. *Id.* at 21:20. This evidence is consistent with Larde's account that the encounter continued beyond the parking lot.

23

evaluation[]" can also be an adverse employment action. *Marrero*, 304 F.3d at 23.

In *Sánchez-Rodríguez*, the First Circuit held that a four-month interval between an employee's complaint and the adverse action was sufficient to satisfy the but-for causation requirement. 673 F.3d at 15. The time periods between Larde undertaking protected activity and the subsequent adverse actions were significantly shorter than was the case in *Sánchez-Rodríguez*. Upon returning to work on October 15, 2018, Larde immediately learned that the Zoo had relocated his office to the shared space. Defs.' SOF ¶ 25. He also received verbal counseling less than three weeks later for failing to immediately return Chabot's call on November 4, 2018, which Larde maintains was issued for retaliatory reasons. *Id.* ¶¶ 41-42.

It is also significant that prior to taking FMLA leave, Larde had never been subjected to formal discipline and had received generally favorable performance reviews. Larde also notes the temporal connection between his second return from leave on August 24, 2019, his complaints to Zoo management about being targeted and treated more harshly than other employees on account of his race on September 19 and October 1, 2019, and his termination on October 28, 2019, Larde Aff. ¶¶ 62-65.

### b.  Legitimate, Non-Discriminatory Reason

In addition to the allegations of deficient performance by Larde and his checkered disciplinary record, the Zoo explains that Larde's office was relocated because the Zoo's security equipment was installed in Larde's previous office, and the Head of Security was moved there as a result.  Defs.' Mot. Summ. J. at 19.

### c.  Pretext Analysis

Larde questions the credibility of the Zoo's explanation of absence of pretext.  For example, he counters that the Zoo's proffered reason for relocating his office space is "simply misleading and untrue," Larde Aff. ¶ 99, because the security equipment could easily have been moved into an alternative office because it was not bulky or permanently fixed.  Taken together with the temporal proximity between Larde's protected actions and the adverse employment actions, as discussed above, there is sufficient dispute of fact "as to whether retaliation was the real motive underlying [the adverse employment actions]." *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012); *Fournier v. Massachusetts*, 2021 WL 4191942, at *4 (1st Cir. Sept. 15, 2021), citing *Harrington*, 668 F.3d at 33 (evidence of pretext can include: "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer,'

the close temporal proximity between the protected conduct and the adverse action, or the sequence of events leading up to the adverse action").

In sum, Larde has produced just enough to avoid dismissal of his retaliation claims at the summary judgment stage.[8]  Thus, Counts VI, VII, VIII, IX, and X survive for trial.[9]

## ORDER

For the foregoing reasons, the motion for summary judgment is *ALLOWED* as to Counts I, II, III, IV, V, and XI.  The motion for summary judgment is *DENIED* as to Counts VI, VII, VIII, IX, and X.  The Clerk will enter partial summary judgment on the identified Counts and set the balance of the case for trial.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[8] Because Larde cannot rely on temporal proximity for his WCA claim, he cannot meet the causation element.  *See Gil v. Vortex, LLC*, 697 F. Supp. 2d 234, 243 (D. Mass. 2010) (chronological proximity alone cannot establish causation where "there are no facts (other than timing) alleged from which an inference of a discriminatory animus could be drawn").  Thus, summary judgment will therefore enter as to Count XI.

[9] Out of the remaining claims, only Count IX can proceed against Davis Cain and Chabot.  As discussed earlier, Larde's federal law claims do not permit a finding of individual liability.